357 P.2d 95

Arthur F. FISHER, Plaintiff-Respondent,

v.

IDAHO MINING & MILLING, INC., a
corporation, Defendant-Appellant.

No. 8902.

Supreme Court of Idaho.

Nov. 22, 1960.

Frank V. Barton, Lewiston, for appellant.

William H. Foster, Grangeville, for respondent.

TAYLOR, Chief Justice.

Plaintiff (respondent) a former school teacher, had purchased a farm near Carlton, Oregon, about three years prior to the transaction here involved. He had employed loggers and logged off about 250,000 board feet of timber from the farm. Other than that he had never bought or sold timber. During September, 1958, he observed an advertisement in several issues of the

Oregonian, published in Portland. One such ad, under date of September 14, 1958, in material part is as follows:

"Mining firm clearing ground to dredge has over 10 million feet 8" BHD to 30" BHD Lodgepole Pine and Spruce. Will sell for $15,000 cash. No slash charge or disposal. Located 40 miles south of Grangeville, Idaho. * * * Idaho Mining & Milling, Inc., Box 502, Lewiston, Idaho, Phone SH 3-3398."

September 29, 1958, plaintiff in company with J. W. Parks and Charles E. Jewell went to Grangeville to investigate the timber offer. They were met there by Marion Jungert, a director and secretary-treasurer of the defendant (appellant) corporation. Marion Jungert took the three out to the Florence mining district, where the timber was located. The four spent some three to five hours walking over a portion of defendant's mining claims, viewing the timber thereon. Marion told plaintiff the defendant had 10 million board feet of merchantable timber upon the property 8 to 30 inches breast-high diameter, which the company would sell for $15,000 in cash, or with a sizeable down payment, would sell it at $2 per thousand upon the basis of a cruise to be made at the buyer's expense. The party then returned to Grangeville where plaintiff inquired at sawmills there as to the price of "studs". After a further conversation with Marion Jungert, the group went to Lewiston to the home of Philip Jungert, president of the defendant corporation, where negotiations were continued between the two Jungerts and the plaintiff. Plaintiff agreed to buy the timber for $15,000—$4,000 down, $2,000 February 1, 1959, and $9,000 December 1, 1959, with interest. A "Timber Sales Agreement" was drawn by defendant's attorney, for the sale by defendant to plaintiff of "all of the merchantable timber" upon the land particularly described in attached exhibits A and B. Exhibit A is a copy of a description of the land and exhibit B is a copy of a plat, both of which had been attached to the Forest Service "Timber Sale Contract." Plaintiff expressed a desire to have the contract checked by an attorney before signing, but, being assured it was a standard timber sales contract, and having been advised by both the Jungerts that other parties were seeking to buy the timber— some of whom were on their way to Lewiston at the time for that purpose—the plaintiff executed the agreement and made the down payment.

The Jungerts advised plaintiff that defendant had purchased the timber from the U. S. Department of Agriculture, Forest Service, and testified that at the meeting at Lewiston they exhibited to the plaintiff, and the plaintiff examined, the contract of sale executed by the Forest Service and defendant. Plaintiff denied that the

Jungerts showed him the Forest Service contract and testified that the first time he saw it was at the Forest Service office in Grangeville about the 1st of December, 1958.

After the execution of the contract, plaintiff sent a tractor and crew into the area and did some work on the access road. He also hauled in parts of a sawmill, some of which were subsequently stored at Grangeville. Some time during these operations plaintiff was advised by certain individuals that they owned mining locations in the Florence basin, upon which some of the timber stood, and that they would not permit him to log the timber thereon. It was then plaintiff went to the Forest Service office and examined defendant's purchase contract. That contract, dated August 25, 1958, provides for the sale by the U.S.D.A. to the defendant of "All timber on dredge ground (streambed that can be reached by a bucket elevator type dredge, such ground known as alluvial deposits) and all timber within 75′ of the dredge ground (75′ on either bank) on the following claims: * * *." Seven mining claims are described and also approximately 10 acres upon a proposed landing strip.

The Forest Service contract provides for the sale of an estimated 947,000 board feet, "more or less," of saw logs at $1 per thousand, stumpage, for a total consideration of $947. The recited consideration is subject to revision upward or downward as may be determined by actual scale. The contract further provides:

"* * * All trees are merchantable which contain 1 or more merchantable logs * * *.

"All logs are merchantable which are not less than 8 feet long, at least 8 inches in diameter inside bark at the small end and contain a net of 33⅓ percent of their gross scale; provided that no log scaling less than 20 bd. ft. shall be considered merchantable; * *."

The defendant owned no timber except that which it had purchased by means of this contract with the Forest Service.

Plaintiff commenced this action January 5, 1959, for rescission of the contract and for recovery of the down payment and out-of-pocket expenses incurred in preparation for performance, alleging the contract was induced by fraudulent representations made by defendant, and that he was damaged thereby.

The defendant denied the fraud and by cross-complaints sought recovery of the balance due upon the contract.

The trial court found that defendant had falsely represented to plaintiff that it had 10 million board feet of timber available for sale to plaintiff; that in fact it had only the 947,000 board feet of timber, more or less, described in its contract with the Forest

Service; that plaintiff relied upon defendant's representations in entering into the contract, in making the down payment, and in incurring the expenses claimed. Judgment was entered in favor of plaintiff and against defendant for rescission of the contract, recovery of the down payment, and $350 expenses incurred in pursuit of the contract. Defendant brought this appeal.

By its assignments of error defendant urges that the evidence is insufficient to support the findings of the various elements of actionable fraud.

The defendant never had a cruise made of the timber until after this action was commenced. Its representation of 10 million board feet was a mere guess. Opposed to this is the Forest Service sale contract, in which the merchantable timber is estimated at 947,000 board feet. This is supported by the testimony of the district ranger, Howard, and forester, Hilding, that the Forest Service sale to the defendant and the estimate of volume of timber therein set out was based upon an actual cruise made by district ranger, John Morrison.

Ranger Howard further testified that he had worked for the Forest Service for about eleven years and had spent a fair share of that time in marking and cruising timber; that he had not cruised the timber involved, but had been over the area several times; that he had in his office the notes and cruise report made by Morrison;

that in his opinion there was not 10 million board feet of timber, 8″ breast-high diameter to 30″ breast-high diameter of lodgepole pine and spruce in the area covered by defendant's contract with the Forest Service; that there was no doubt in his mind that the volume would not "even approach 10-million feet."

In defense of the representation of 10 million board feet, Philip Jungert testified that the contract he made with the Forest Service included an area which was outside of, and not covered by, the Morrison cruise, and that he and Howard agreed that this additional area would be included in the sale at the consideration of $75.

Referring to this additional area, ranger Howard testified that the average of the Morrison cruise was extended to this additional area in arriving at the total estimated volume of 947,000 board feet. Neither witness testified to the number of acres involved in the land lying outside of the Morrison cruise.

Assuming that Jungert was right as to the additional consideration involved, it is apparent that the volume of timber on the area lying outside of the Morrison cruise was not very great.

Philip Jungert also testified that the defendant reserved 10 acres of timber land from its sale to the plaintiff in order to have available timber for buildings needed in its mining operations; that it had logged

off about 50,000 board feet from this 10 acres, and he estimated the total volume of timber on the 10 acres at 100,000 board feet.

From the foregoing it is evident that the defendant reserved from its sale to plaintiff an equal or greater volume of timber than it acquired from the Forest Service by the addition of land lying outside of the Morrison cruise.

Further defending the representation of 10 million board feet, Philip Jungert contended in his testimony that defendant acquired from the Forest Service and sold to plaintiff, in addition to the merchantable timber as described in the Forest Service contract as a minimum 8″ top, all logs between the 8″ top and 8″ breast-high diameter, as described in the representation made to plaintiff. He did not attempt to estimate the volume of timber between these two minimum diameters. Assuming its volume to be considerable, it would not be sufficient to bring the total near 10 million board feet, according to the testimony of ranger Howard.

The estimate of 947,000 board feet "more or less" in the Forest Service contract cannot be expanded sufficiently to support or justify a representation of 10 million board feet.

"* * * The words 'more or less' would permit a slight and immaterial variation from the quantity specified, but it would amount to misrepresentation and breach of warranty where there is such a substantial and material variance as disclosed by the undisputed testimony in this case." Columbia River Door Co. v. Priest, 128 Or. 359, 274 P. 116, at page 117.

The court's finding of misrepresentation as to the volume of the timber is supported by substantial and competent evidence and is therefore controlling here. I.C. § 13–219; Shurrum v. Watts, 80 Idaho 44, 324 P.2d 380; Fuchs v. Lloyd, 80 Idaho 114, 326 P.2d 381; Homefinders v. Lawrence, 80 Idaho 543, 335 P.2d 893; Nordick v. Sorensen, 81 Idaho 117, 338 P.2d 766; Clayton v. Clayton, 81 Idaho 416, 345 P.2d 719.

Defendant further urges that the representations as to volume made by the Jungerts were but expressions of opinion, not knowingly false, and not intended to deceive plaintiff. Defendant called attention to the fact that the Jungerts were essentially miners and without much experience in logging or timber sales. However that may be, the evidence supports the finding of the trial court that they did not show the contract with the Forest Service to the plaintiff and that he did not see such contract until after the present sale was consummated. The Jungerts knew that the Forest Service upon a cruise had estimated the timber at 947,000 board feet. They also knew that plaintiff had no reliable infor-

mation as to the volume of the timber. So circumstanced, they cannot be heard to say that their representation of 10 million board feet was innocently made. They either knew the representation was false, or they made it recklessly without regard to its truth or falsity. The applicable rule is set out in Turner Agency v. Pemberton, 38 Idaho 235, at page 239, 221 P. 133, 135, and quoted with approval in Morrow v. Wm. Berklund Forest Products Co., 81 Idaho 428, 440, 346 P.2d 623, 630, as follows:

" ' * * * where the circumstances impose upon the vendor a special duty to know the truth of his representations, or where the nature of the situation is such that he is presumed to know the facts to which his representation relates. * * * In such cases a misrepresentation is fraudulent even though not made knowingly or willfully or with actual intent to deceive.' "

Defendant further contends the evidence does not show that plaintiff relied upon the representations made by Jungerts, citing the fact that he personally viewed the timber and had the advice of the two men whom he brought with him. The evidence shows that Parks had been employed by a lumber company in Oregon as a scaler and at the time was temporarily laid off by reason of ill health, and was in fear of losing his job with the lumber company; and that Jewell had been employed by plaintiff and, with two other men, had done the logging on plaintiff's farm. Plaintiff testified that while he was agreeable to receiving their advice, he considered that both men were more interested in securing employment in the prospective logging of the timber involved, than in protecting plaintiff from an unwise venture. For that reason he discounted their advice. He also testified that during their viewing of the timber both men poked fun at the size of the trees and compared them with trees in other areas, to the extent that Marion Jungert at one point stopped and asked plaintiff if he was really interested in seeing the timber. Plaintiff explained that he had come a long way at considerable expense and would like to go on, and that it was he who was proposing to buy, not the two who were with him. The evidence supports the court's finding that plaintiff did rely upon the representations made by Jungerts.

Defendant also urges that plaintiff was not justified in relying upon the representations made by Jungerts; that the facts were available to him at the Forest Service office. The representation was of a material existing fact made by persons who were presumed to know its truth or falsity. Under such circumstances, plaintiff was entitled to rely upon the representation made to him by the Jungerts, and was not required to investigate the public records. Goody v. Maryland Casualty Co., 53 Idaho

523, at page 529, 25 P.2d 1045, quoted in Morrow v. Wm. Berklund Forest Products Co., supra, 81 Idaho at page 440, 346 P.2d 623, and cases there cited.

After the action was commenced the defendant had a purported cruise of the timber made by one Olson, who reported a volume of 10,868,142 board feet of timber, 8 inches and up, breast-high diameter. The Olson cruise consisted of spot sampling of three one-acre tracts chosen by him as average units out of a total of 720 acres, and a "cruise" of the 10-acre proposed air strip, and a "straight through" cruise of the entire area for spruce, and an estimate of 200,000 board feet of white fir. The average of the three one-acre units was multiplied by 720 to arrive at the total of 9,695,-520 board feet of lodge pole pine. The manner of making, or the percentage basis of, the cruise on the 10-acre tract was not testified to; nor was the "straight through" cruise for spruce, resulting in 823,222 board feet, defined or described. Olson testified that a "very high" percentage of the timber was 8 inches breast-high diameter. The trial court was fully warranted in regarding this cruise as unreliable.

Judgment affirmed.

Costs to respondent.

SMITH, KNUDSON, McQUADE and McFADDEN, JJ., concur.